IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | I N F O R M A T I O N |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:15  CR  0328 |
| v. | ) | CASE NO._____ |
| | ) | Title 18, United States Code, |
| GREGORY GOLDSTEIN, | ) | Section 1349 |
| | ) | |
| Defendant. | ) | JUDGE CAUGHAN |

The United States Attorney charges:

1.     GENERAL ALLEGATIONS

At all times relevant to this Information, except where otherwise noted:

A.     Defendant, Relevant Entities, and Bank Accounts

1.     Defendant GREGORY GOLDSTEIN (hereinafter, "Defendant") was a resident of Stevenson Ranch, California. Defendant obtained his broker's license in or around May 1995. Defendant was a registered broker with the Financial Industry Regulatory Authority ("FINRA") and an investment advisor representative.

2.     Bridges Investments, Inc. ("Bridges") was a Nevada corporation with its principal place of business at 9 Via Del Garda, Henderson, Nevada 89011. Bridges was formed in or

1

around April 2005. Angelique D., Zirk de Maison's wife, was the president, director, and secretary of record.

3.      Suprafin, Ltd. ("Suprafin") was a Wyoming corporation with its principal place of business at 1621 Central Avenue, Suite 3380, Cheyenne, Wyoming 82001. Suprafin was formed in approximately 2009. Zirk de Maison was the president and vice president of Suprafin, and Angelique D. was the treasurer.

4.      Sunatco, Ltd. ("Sunatco") was a Wyoming corporation with its principal place of business at 1621 Central Avenue, Cheyenne, Wyoming 82001. Sunatco was formed in approximately 2013. Zirk de Maison was the chairman and chief executive officer of Sunatco.

5.      Wealthmakers, Ltd. ("Wealthmakers") was a Wyoming corporation with its principal place of business at 1005 S. Center Street, Redlands, California 92373. Wealthmakers was formed in approximately 2007. Thomas R. was the president, and Zirk de Maison was the vice president of Wealthmakers.

6.      Walker River Investments Corp. ("Walker River") was a Wyoming corporation with its principal place of business at 2510 Warren Avenue, Cheyenne, Wyoming 82001. Walker River was formed in approximately 2011. Margaret J. was the president of Walker River, but Zirk de Maison maintained de facto control of all aspects of the business.

7.      Marquis Financial Services of Indiana, Inc. ("Marquis") was a corporation organized under the laws of the State of Wisconsin with its principal place of business in Encino, California. Marquis was a member of, and regulated by, FINRA (as Central Registration Depository Number 20733), as well as other stock, option, and commodity exchanges and self-regulatory organizations. Defendant was the controlling member of Marquis.

2

8.      Merrimen Investments, Inc., ("Merrimen") was a Wyoming corporation with its principal place of business at 10409 Strathmore Drive, Santee, California 92071. Merrimen was formed in approximately 2010. Zirk de Maison was the principal of Merrimen.

9.      Worldbridge Partners, Inc. ("Worldbridge") was a Nevada corporation with its principal place of business at 29191 Weybridge Drive, Westlake, Ohio 44145. Worldbridge was formed in approximately 2009. Jason C. was the president, and Louis M. was the vice president of Worldbridge.

10.     Structured Management, Inc. ("SMI") was a Nevada corporation with its principal place of business at 29191 Weybridge Drive, Westlake, Ohio 44145. SMI was formed in approximately 2003. Jason C. was the president and director of SMI.

11.     Small Cap Resource Corp. ("Small Cap Resource") was a New York corporation with its principal place of business at 14 Vanderventer Avenue, Suite 138, Port Washington, New York 11050. Small Cap Resource was formed in approximately 2011. Kieran K. was the president of Small Cap Resource.

12.     SB3, LLC ("SB3") was a Wyoming corporation with its principal place of business at 10409 Strathmore Drive, Santee, California 92071. SB3 was formed in approximately 2007.

13.     Kensington & Royce, Ltd ("Royce") was a Nevada corporation with its principal place of business at 646 W. Highland Avenue, Redlands, California 92373. Royce was formed in approximately 2006. Angelique D. was the president of Royce.

14.     Global Marketing Consultants, Inc. ("Global Marketing") was a Wyoming corporation with its principal place of business at 2710 Thomes Avenue, Cheyenne, Wyoming

3

82001. Global Marketing was formed in approximately 2009. Paul C. was the principal of Global Marketing.

15.     Wall Street At Home.com, Inc. ("WAH.com") was a New York corporation with its principal place of business at 16501 Ventura Boulevard, Suite 512, Encino, California 91436. WAH.com was formed in approximately 1999. Defendant was the chief executive officer of WAH.com.

B.     The Relevant Publicly Traded Companies

16.     Lenco Mobile, Inc. ("Lenco") was incorporated in the State of Delaware in approximately 1999 under the name Schochet Holdings Corporation. On or about February 20, 2009, after also using the company names CIC Holding Company, Inc., Global Wear, Ltd., and Sovereign Wealth Corporation ("Sovereign Wealth"), the company changed its name to Lenco. It had offices in Santa Barbara, California. When the company was named Sovereign Wealth, the common stock traded under the symbol "SOVW," and its purported business purpose was the same as when it used the name Lenco; that is, the management of technology solutions for brand owners and mobile telephone network operators. Lenco's stock traded under the symbol "LNCM."

17.     Kensington Leasing, Ltd. ("Kensington") was incorporated in the State of Nevada on or about June 27, 2008, with offices in Redlands, California. Kensington purported to specialize in leasing equipment to legal, medical, and real estate professionals. Kensington's common stock traded under the symbol "KNSL."

18.     Casablanca Mining, Ltd. ("Casablanca") was incorporated in the State of Nevada on or about June 27, 2008 under the name USD Energy Corporation ("USD"). On or about February 17, 2011, the company changed its name to Casablanca. Casablanca had offices in

4

Santee, California. When Casablanca was named USD, the common stock traded under the symbol "UEGY," and its purported business purpose was exploration stage oil and gas production. After changing to Casablanca, the purported business purpose switched to the acquisition, exploration, development and operation of precious metal properties in Chile. Casablanca's stock traded under the symbol "CUAU."

19.    Lustros, Inc. ("Lustros") was incorporated in the State of Utah on or about July 30, 1980 under the name MAG Enterprises, Inc. On or about April 12, 2012, after also using the company names Safari Associates, Inc. and Power-Save Energy Company, the business changed its name to Lustros. Lustros had offices in Redlands, California. Under the name Lustros, the purported business purpose was the production food grade copper sulfate. Lustros' stock traded under the symbol "LSTS."

20.    Gepco, Ltd. ("Gepco," and together with Lenco, Kensington, Casablanca, and Lustros, the "Manipulated Public Companies") was the latest corporate iteration of the company that started out as Kensington. After abandoning the equipment leasing business under Kensington, the company changed its name to Wikifamilies, Inc. with the purported business purpose of designing, developing and operating a social media website. After a failed merger with ClairNET, Ltd. the company was abandoned until reclaimed through court proceedings that appointed Trish M. as the custodian of the company. On or about September 11, 2013, the company changed its name to Gepco. The purported business purpose of Gepco was to sell and broker high-end investment grade diamonds obtained from wholesale diamond cutters. Gepcos' common stock traded under the symbol "GEPC."

21.    Stock for all of the Manipulated Public Companies was quoted on OTC Markets, Inc. ("OTC Markets"), an inter-dealer quotation service that provided quotations, prices, and

financial information for certain over-the-counter securities and issuers. Companies trading on OTC Markets tended to be extremely small, and the stock in those companies tended to be closely held (that was, owned by a small number of individuals) and thinly traded (that was, traded far less frequently than stocks in larger companies on larger exchanges).

C.     Defendant's Co-Conspirators

22.     For each of the Manipulated Public Companies, Defendant's co-conspirator, Zirk de Maison, controlled a substantial number of outstanding shares through his personal companies, co-conspirators, and associates over which he had influence and control. At times, Zirk de Maison was also listed as an officer or director of the Manipulated Public Companies. Zirk de Maison used co-conspirators to identify and solicit investors to purchase his shares of the Manipulated Public Companies in the open market and through private placement transactions. Once potential investors were identified for private placements, for instance, Zirk de Maison combined with the co-conspirators, induced the potential investors to purchase shares and close the purported deal.

(i)     Consultants

23.     Zirk de Maison used consultants to access wealthy potential investors that the consultants had developed as contacts and clients over time. Zirk de Maison paid undisclosed commissions of cash and stock to the consultants when they persuaded their clients to purchase Zirk de Maison's shares in the Manipulated Public Companies.

24.     Jason C., a resident of Gates Mills, Ohio, was a former broker who later purportedly consulted almost exclusively for Zirk de Maison's publicly traded microcap companies (defined below). Effective on or about May 27, 2003, FINRA barred Jason C. from association with any FINRA member in any capacity. Jason C. solicited potential investors to

6

purchase stock in the Manipulated Public Companies without disclosing that he received commissions from Zirk de Maison, that it was Zirk de Maison's and Jason C.'s shares his clients were purchasing, and that his clients' investments were used to enrich the co-conspirators. Zirk de Maison, Jason C., and others, agreed to use private placements, stock promoters, and non-arms-length trading with related parties to create the illusion of volume, to inflate the stock price, and to divest their own shares.

      (ii)    <u>Registered Brokers</u>

    25.    Zirk de Maison used registered brokers such as Defendant to liquidate free trading shares of stock in the Manipulated Public Companies. Zirk de Maison paid Defendant and other registered brokers' commissions for purchasing Zirk de Maison's shares of the Manipulated Public Companies without Defendant and other brokers disclosing the commissions to their clients.

    26.    Defendant, a resident of Stevenson Ranch, California, was registered as a broker with FINRA. In or around July 2001, to in or around February 2013, Defendant was employed as a broker by Marquis, a broker-dealer registered with the SEC and FINRA, at its office in Tarzana, California. Defendant was the controlling member of Marquis.

    27.    Stephen Wilshinsky, a resident of Woodland Hills, California, was registered as a broker with FINRA. Wilshinsky worked as a registered broker with Oppenheimer & Co. ("Oppenheimer") from in or around November 2004, through in or around March 2009, and with Marquis at its office in Tarzana, California, from in or around April 2009, through in or around June 2011.

28.     Jack T., a resident of Glen Cove, New York, was registered as a broker with FINRA. In or around July 2010, to in or around September 2011, Jack T. was employed as a broker by Marquis at its office in Tarzana, California.

(iii)     "Boiler Room" Promoters

29.     Zirk de Maison also used promoters in so-called "boiler rooms" to cold call and solicit potential investors to purchase shares of the Manipulated Public Companies. Zirk de Maison dictated what stocks the promoters pushed. The cold calls to potential investors typically coincided with favorable press releases or other information that Zirk de Maison caused to be released. The boiler room promoters touted the Manipulated Public Companies using high pressure sales tactics and misrepresentations about the value of the Manipulated Public Companies and their stock. The boiler room promoters did not disclose that Zirk de Maison paid commissions to them on the sale of Zirk de Maison's stock to the investors, either on the open market or through private placements.

30.     Kieran K., a resident of Port Washington, New York, was registered as a broker with FINRA. Kieran K. started his own business, Small Cap Resource, which functioned as a boiler room and was in the business of stock promotions.

D.     The SEC and Securities Regulations

31.     The United States Securities and Exchange Commission (the "SEC") was an independent agency of the United States which was charged by law with protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities, including securities traded on the United States-based stock exchanges. Stock for the Manipulated Public Companies was registered with the SEC.

8

32.     Federal securities laws and regulations prohibited fraud in connection with the purchase and sale of securities, including the use of false and misleading statements and the failure to disclose material information to:  (a) the SEC in publicly available filings; (b) brokerage firms and transfer agents involved in the purchase and sale of stock in companies subject to SEC regulation; and (c) the public.  Federal securities laws and regulations also prohibited the manipulation of stock through, among other things, sales made at the times and at prices set by those trading the stock rather than by market forces.

33.     Title 15, United States Code, Section 78j(b), made it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange, to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe as necessary or appropriate in the public interest or for the protection of investors, including:  (a) employing devices, scheme, and artifices to defraud; (b) making untrue statements of fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated as a fraud upon investors, in connection with the purchase and sale of the securities.

34.     Failure to disclose commission payments to investors from third parties, including payments from issuers, was considered an omission of a material fact as part of a securities transaction.

9

E.    Relevant Regulatory Principles and Definitions

35.    "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which had a low market capitalization. Microcap stocks were subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that were traded on notable exchanges such as the National Association of Securities Dealers Automated Quotations ("NASDAQ") and the New York Stock Exchange ("NYSE"). NASDAQ and NYSE had specific standards that were monitored and enforced for a company to have its stock traded on those exchanges. Additionally, large blocks of microcap stock were often controlled by small groups of individuals, which enabled those in the group to control and orchestrate manipulative trading in those stocks.

36.    "Wash trades" were purchases and sales of securities that matched each other in price, volume, and time of execution, and involved no change in beneficial ownership. For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of a company through Broker A while simultaneously selling 100 shares at $5.00 per share of the company through Broker B.

37.    "Matched trades" were similar to wash trades, but involved a related third person or party who placed one side of the trade. For example, a matched trade took place when Investor A bought 100 shares at $5.00 per share of a company through a broker, while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per share of the company through a broker.

38.    "Marking the close trades" involved attempting to influence the closing price of a security by executing purchase or sale orders at or near the close of normal trading hours. Such activity could artificially inflate or depress the closing price for the security.

10

39.     Wash trades, matched trades, and marking the close trades were used to create the appearance that the stock price and volume raised as a result of genuine market demand for the securities.

## II.     FACTUAL ALLEGATIONS

40.     From on or about September 21, 2007, through on or about April 3, 2014, Defendant, together with others known and unknown to the United States Attorney, agreed to defraud investors and potential investors in the Manipulated Public Companies by issuing millions of shares to themselves at little or no cost and then artificially controlling the price and volume of traded shares through, among other means:  (a) paying undisclosed commissions to brokers and former brokers for directing client funds to make both authorized and unauthorized investments; (b) fraudulently concealing the co-conspirators' ownership interests in the Manipulated Public Companies; and (c) engineering price movements and trading volume in the stocks.

A.     The Lenco Manipulation Scheme

    (i)     Control of the Stock

41.     Lenco originated as a public company in approximately 1999 under the name of Shochet Holdings Corporation ("Shochet"), which purportedly provided financial services.  After Shochet changed its name to Sutter Holdings Company, Inc. ("Sutter"), the primary business focus was on mortgage origination.  By on or about December 31, 2005, Sutter ceased all of its business operations and became a shell company.  In or around November 2006, the company changed its name to CIC Holding Company, Inc., in which Zirk de Maison was the president and Angelique D. a director.  Zirk de Maison and Angelique D. personally held over 3,000,000 shares each of CIC Holdings before the transformation of the company into Lenco.

42.  Zirk de Maison obtained control of shares in Lenco and its predecessor using a variety of associates and other companies. For example, on or about October 31, 2007, Zirk de Maison caused Lenco to issue 210 shares of Preferred Series B stock to Angelique D. Then, on or about April 8, 2008, Angelique D. converted 42 shares of Preferred Series B stock to 2,100,000 common shares. On or about April 18, 2008, Bridges and Angelique D. were issued 772,000 shares total of common stock. On or about May 9, 2008, Trisha M. and Stephen B., two of Zirk de Maison's associates, were each issued 800,000 shares of common stock.

(ii)    The Fraudulent Stock Manipulations

43.  After gaining control of Lenco's unrestricted common stock, Defendant and Zirk de Maison, together with others, devised and intended to devise a scheme whereby they fraudulently inflated Lenco's share price and trading volume and then orchestrated the sale and purchase of the unrestricted Lenco stock at a profit when the share price reached desirable levels.

44.  It was a part of the scheme to raise the stock price through manipulative stock trading techniques to a level beneficial to the co-conspirators. Defendant and other brokers purchased public shares using accounts belonging to clients, some of whom were unaware that they held the stock. This fraudulent arrangement reduced the possibility that the stock would be subsequently resold in the market, which gave the co-conspirators control over the trading activity and kept the price artificially inflated for an extended period on OTC Markets quotes. Defendant, Stephen Wilshinsky, and Jack T. all used their position as registered brokers to purchase Zirk de Maison's shares in Lenco through their client accounts.

45.  The first Lenco pump started on or about March 7, 2008, with the co-conspirators using a combination of matched trades, wash trades, and marking the close trades to inflate the stock price. During this first period, the co-conspirators manipulated Lenco's stock price by

12

raising it from a low of approximately $0.10 per share (with trading volume of approximately 5,000 shares per day) in or around March 2008 to a high of approximately $4.95 per share (with trading volume of approximately 327,840 shares per day) just a month later on or about April 25, 2008.

46.     Because many of the outstanding shares were restricted, the price could not immediately drop when the co-conspirators stopped pumping up the stock. Approximately one year later, on or about March 6, 2009, however, when restrictions began to lift, the share price was quoted at approximately $3.00 per share. After another pump cycle, in or around November 2011, the stock eventually dropped to approximately $0.24 per share.

47.     The value of Lenco's stock had little or no relation to its then current and future earnings potential or business operations. At its highest closing price of approximately $6.50 per share on or about July 25, 2008, Lenco's market capitalization was approximately $418,007,037 based on approximately 64,308,775 shares outstanding. However, on or about November 9, 2009, Lenco filed a form with the SEC, signed by Lenco's president, reporting that as of December 31, 2008, Lenco had only $2,854,041 in total assets (including intangibles such as "goodwill"), $805,085 in total liabilities, and $781,420 claimed in net income for the year ending December 31, 2008.

E.     The Kensington Manipulation Scheme

(i)     Control of the Stock

48.     Kensington originated as a public company in or around 2009 with a purported focus on leasing equipment to real estate professionals. According to an SEC filing, on or about January 15, 2009, Angelique D. was the chief executive officer and Defendant was the chief

financial officer. In an amended filing on or about March 25, 2009, Defendant was replaced as chief financial officer by Landre M., the husband of Zirk de Maison's personal assistant.

49.     Initially, Zirk de Maison caused the issuance of only 20,000 shares of stock to Angelique D. Through a purchase agreement dated on or about April 9, 2010, Angelique D. gained an additional 6,000,000 shares, purportedly in exchange for approximately $480,000. Zirk de Maison also orchestrated purchase agreements whereby one of his companies, Merrimen, entered into a purchase agreement with Kensington with an option to buy up to 24,000,000 shares. On or about November 9, 2010, Zirk de Maison caused Merrimen to exercise a portion of the option to purchase 2,500,000 shares of Kensington. Zirk de Maison distributed the purchased shares as gifts. On or about November 9, 2010, Zirk de Maison gifted approximately 1,011,184 shares. On or about December 7, 2010, Zirk de Maison gifted approximately 1,488,816 shares.

50.     On or about December 1, 2010, Zirk de Maison caused Merrimen to sell the right to purchase the remaining 21,500,000 shares to Angelique D.

(ii)     The Fraudulent Stock Manipulations

51.     After gaining control of Kensington's unrestricted shares, Defendant and Zirk de Maison, together with others, devised and intended to devise a scheme whereby they fraudulently inflated Kensington's share price and trading volume and then orchestrated the sale and purchase of the unrestricted Kensington stock at a profit when the share price reached desirable levels.

52.     The co-conspirators sought to manipulate the Kensington stock through manipulative stock trading techniques to a price beneficial to the co-conspirators. Having created the shell company, the co-conspirators controlled a majority of the shares outstanding,

enabling them to manipulate the share price. Those public shares were typically purchased by brokers using accounts belonging to clients. Defendant, Stephen Wilshinsky, and Jack T. used their position as registered brokers to purchase Zirk de Maison's shares in Kensington through their client accounts.

53.     The first Kensington pump started on or about March 29, 2010. That day, Trisha M., at the direction of Zirk de Maison, sold 40,000 shares. Those shares were purchased almost exclusively in client accounts held at Marquis, Defendant's brokerage firm. During this first period, the co-conspirators manipulated Kensington's stock price by setting it at a price of approximately $3.80 per share (with trading volume of approximately 10,500 shares that day).

54.     The value of Kensington's stock had little or no relation to its then current and future earnings potential or business operations. On or about September 29, 2010, Kensington's market capitalization at its closing price of approximately $4.50 per share was approximately $35,550,000 based on approximately 7,900,000 shares outstanding. However, on or about November 22, 2010, Kensington filed a form with the SEC, signed by Trisha M., stating as of on or about September 30, 2010, Kensington had approximately $935,249 in total assets (including intangibles such as "goodwill"), $374,441 in total liabilities, and $4,071 in revenue since the inception of the business. The form indicated a net loss of $83,122 since inception. On or about September 4, 2012, the stock had fallen to $0.02 per share.

F.      The Casablanca Manipulation Scheme

        (i)      Control of the Stock

55.     Casablanca originated as a public company in or around 2011 with a purported focus on mining precious metals in Chile. According to an SEC filing, on or about March 31,

2011, Zirk de Maison was the president of Casablanca, and Trisha M. was the former chief executive officer.

56.     Upon formation as USD, Casablanca's predecessor company, Zirk de Maison caused the issuance of 600,000 shares of stock to Trisha M. in consideration of purported set up costs. Through a purchase agreement dated on or about December 7, 2010, Zirk de Maison, Angelique D., Thomas R., and companies controlled by Zirk de Maison, collectively purchased from USD approximately 21,500,000 shares of stock for the purported amount of $1,100,000. On or about January 19, 2011, Zirk de Maison caused Casablanca to issue approximately 800,000 shares of stock to Wealthmakers, which he controlled through Angelique D. On or about March 20, 2011, Zirk de Maison caused Casablanca to enter into a purchase agreement with Angelique D. to sell her an additional 1,000,000 shares of stock in installment.

        (ii)    The Fraudulent Stock Manipulations

57.     After gaining control of Casablanca's shares, Zirk de Maison and Defendant, together with others, devised and intended to devise a scheme whereby they fraudulently inflated Casablanca's share price and trading volume and then orchestrated the sale and purchase of both the unrestricted and restricted Casablanca stock at a profit when the share price reached desirable levels.

58.     The co-conspirators sought to manipulate the Casablanca stock through manipulative stock trading techniques to a price beneficial to the co-conspirators. Having created the shell company, the co-conspirators controlled a majority of the shares outstanding, enabling them to manipulate the share price. Those public shares were typically purchased by Defendant and other brokers trading in accounts belonging to clients. Zirk de Maison also used

co-conspirators to solicit potential investors to purchase restricted shares belonging to Zirk de Maison and other co-conspirators.

59.     Extending the stock's artificially inflated price allowed the co-conspirators to also sell restricted shares to investors through private placements. For example, investors could see a stock quoted at $5.00 per share and be willing to buy a restricted version for $2.50 per share, thinking that the stock would still be valuable when the restriction was lifted.

60.     The first Casablanca pump started on or about September 22, 2010. That day, as USD, the company issued a press release touting a letter of intent to acquire a Chilean gold and copper mining company. One month later the stock had reached a share price of $10.01 per share.

61.     The value of Casablanca's stock had little or no relation to its then current and future earnings potential or business operations. On or about May 13, 2011, Casablanca's market capitalization at its closing share price of approximately $8.20 per share was approximately $430,343,199 based on 52,480,878 shares outstanding. However, on or about May 16, 2011, Casablanca filed a form with the SEC, signed by Trisha M., stating as of on or about March 31, 2011, Casablanca listed approximately $6,024,225 in total assets (including intangibles such as "goodwill") and $2,586,327 in total liabilities, and a net loss of $371,691 since inception of the business. The form indicated a net loss of $291,741 for the first quarter of 2011. On or about October 9, 2013, the stock had fallen to approximately $0.05 per share.

G.     The Lustros Manipulation Scheme

    (i)     Control of the Stock

62.     Lustros first appeared as a publicly traded company in or around 2006 under the name Safari Associates, Inc., and later becoming Lustros in or around 2012. According to an

SEC filing, on or about April 18, 2012, Zirk de Maison was the chief executive officer and a member of the board of directors for the company. Trisha M. was the chief financial officer and a member of the board of directors.

63.     As of on or about September 30, 2012, the authorized capital stock of Lustros consisted of 100,000,000 shares of common stock and 10,000,000 shares of preferred stock. On or about March 9, 2012, Zirk de Maison caused Lustros to issue 60,000,000 shares of common stock to obtain the rights to Bluestone, a company owned primarily by Angelique D. In or around April 2012, Zirk de Maison caused Lustros to issue 100,000 preferred shares to himself. In or around June 2012, Zirk de Maison caused Lustros to issue an additional 181,818 shares of common stock to Angelique D.

(ii)     The Fraudulent Stock Manipulations

64.     After gaining control of a majority of Lustros' shares, Defendant and Zirk de Maison, together with others, devised and intended to devise a scheme whereby they fraudulently inflated Lustros' share price and trading volume and then orchestrated the sale and purchase of the Lustros stock at a profit when the share price reached desirable levels.

65.     The co-conspirators sought to manipulate the Lustros stock through manipulative stock trading techniques to a price beneficial to the co-conspirators. Having created the shell company, the co-conspirators controlled a majority of the shares outstanding, enabling them to manipulate the share price. Zirk de Maison primarily used co-conspirators to solicit potential investors to purchase restricted shares belonging to Zirk de Maison and other co-conspirators.

66.     One Lustros pump started on or about October 30, 2013, when the share price was $0.16 per share after having been $1.30 per share one year earlier. Through aggressive promotion by co-conspirators and matching trades to raise volume, the co-conspirators were able

18

to artificially inflate the stock price. Within just over a month, the shares had almost tripled in value to a share price of approximately $0.44 on or about December 5, 2013. By on or about February 7, 2014, the stock price had dropped back down to $0.15 per share, eventually falling to $0.01 per share as of January 5, 2015.

67.     The value of Lustros' stock had little or no relation to its then current and future earnings potential or business operations. On or about November 9, 2012, Lustros' market capitalization at its closing share price of approximately $1.10 per share was approximately $77,830,303 based on 70,754,821 shares outstanding. However, on or about November 14, 2012, Lustros filed a form with the SEC, signed by Trisha M., stating as of on or about September 30, 2012, Lustros had approximately $10,545,799 in total assets (including intangibles such as "goodwill"), $3,098,404 in total liabilities, and a net loss of $3,311,969 since inception of the business. The form indicated a net loss of $1,619,343 for the third quarter of 2012. On or about September 16, 2014, the stock price had fallen to approximately $0.11 per share.

H.     The Gepco Manipulation Scheme

(i)     Control of the Stock

68.     Gepco first appeared as a publicly traded company in 2008 under the Kensington name and eventually became Gepco in 2013. According to an SEC filing, on or about May 14, 2014, Angelique D. was the executive chairman of the company, and Trisha M. was the president, chief financial officer, secretary, and a member of the board of directors.

69.     The authorized capital stock of Gepco consisted of approximately 250,000,000 shares of common stock and 15,000,000 shares of preferred stock. As of on or about March 31, 2014, no shares of preferred stock had been issued. Through convertible notes, Zirk de Maison

caused Trisha M. to obtain approximately 8,000,000 shares of stock and Walker River to obtain approximately 8,835,480 shares. Zirk de Maison caused Gepco to grant an additional 2,000,000 shares of stock to Trisha M. in a subsequent transaction. In or around April 2013, Zirk de Maison, through Suprafin, obtained a note that was converted into approximately 27,670,000 shares of stock. In or around August 2013, Zirk de Maison, through Sunatco, obtained a note that was partially converted into an additional 2,000,000 shares stock.

70. The company's acquisition of GemVest was funded through the issuance of 150,000,000 shares to Peter V., a close friend to Zirk de Maison. Zirk de Maison dictated to Peter V. how and when he sold the shares, allowing Zirk de Maison to retain control of the Gepco stock.

71. In furtherance of the Gepco stock manipulation scheme, the co-conspirators made material omissions regarding the payment of commissions when soliciting investors.

(ii)    The Fraudulent Stock Manipulations

72. After gaining control of Gepco's shares, Zirk de Maison and Defendant, together with others, devised and intended to devise a scheme whereby they fraudulently inflated Gepco's share price and trading volume and then orchestrated the sale and purchase of the unrestricted Gepco stock at a profit when the share price reached desirable levels.

73. The co-conspirators sought to manipulate the Gepco stock through manipulative stock trading techniques to a price beneficial to the co-conspirators. Having created the shell company, the co-conspirators controlled a majority of the shares outstanding, enabling them to manipulate the share price. Zirk de Maison primarily utilized co-conspirators to solicit potential investors to purchase restricted shares belonging to Zirk de Maison and other co-conspirators.

74.    Defendant solicited potential investors to purchase Zirk de Maison's shares through private placements and received thirty percent commissions from Zirk de Maison.

75.    The value of Gepco's stock had little or no relation to its then current and future earnings potential or business operations.  On or about March 31, 2014, Gepco's market capitalization at its closing price of approximately $0.19 per share was approximately $42,037,985 based on approximately 221,252,555 shares outstanding.  However, on or about May 14, 2014, Gepco filed a form with the SEC, signed by Trisha M. and Peter V., stating that as of on or about March 31, 2014, Gepco had accrued a net loss of $89,401 since inception and had accumulated a deficit during the development stage of approximately $458,176.  Gepco's stock was suspended from trading in September 2014 by the SEC.

I.    Profits at Investors' Expenses

76.    The co-conspirators, together with others known and unknown to the United States Attorney, obtained millions of shares at no or little cost in the Manipulated Public Companies and then profited by selling their own shares in Lenco, Kensington, Casablanca, Lustros, and Gepco stock at artificially inflated prices to investors.  Little or no portion of the investments went to fund the operations of the Manipulated Public Companies.  Rather, Defendant, Zirk de Maison, and their co-conspirators used the investments to enrich themselves.

77.    Defendant agreed to have his clients purchase Zirk de Maison's shares of the Manipulated Public Companies on the open market in exchange for an undisclosed commission payment.  Zirk de Maison typically paid, and caused the payment to, Defendant of approximately thirty to fifty percent of the total sales price of the stock Zirk de Maison sold to Defendant's clients, with Zirk de Maison and entities that he controlled receiving the remainder.  In doing so, Defendant, Zirk de Maison, and others, enriched themselves and used, among other stock

manipulative techniques, matched trades to execute transactions and fraudulently inflate the price of the Manipulated Public Companies' stock.

78.     Defendant and his co-conspirators also received shares in the Manipulated Public Companies as commission payments from Zirk de Maison for participation in the conspiracy. Co-conspirators could then sell the shares and keep the proceeds as additional profit for participation in the conspiracy.

79.     Defendant and his co-conspirators profited through their fraudulent scheme relating to the Manipulated Public Companies. Defendant and entities he controlled received approximately $2,445,550 in undisclosed cash commission payments from Zirk de Maison for participating in the conspiracy.

### III.     STATUTORY VIOLATION

#### COUNT 1
(Conspiracy to Commit Securities Fraud, 18 U.S.C. § 1348;
and Wire Fraud, 18 U.S.C. § 1343; in violation of 18 U.S.C. § 1349)

The United States Attorney charges:

80.     The allegations contained in paragraphs 1 through 79 are re-alleged and incorporated as though fully set forth herein.

81.     On or about September 21, 2007, through on or about April 3, 2014, within the Northern District of Ohio, Eastern Division, and elsewhere, Defendant GREGORY GOLDSTEIN, together with others known and unknown to the United States Attorney, did knowingly and intentionally combine, conspire, confederate, and agree with each other, and with others both known and unknown to the United States Attorney, to commit federal offenses, to wit:

22

a.     To defraud any person in connection with any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 and that is required to file reports under section 15(d) of the Securities Exchange Act of 1934; and to obtain, by means of false and fraudulent pretenses, representations, and promises, any money and property in connection with the purchase and sale of any security of an issuer described herein, in violation of Title 18, United States Code, Section 1348 (Securities Fraud); and

b.     To devise and intend to devise a scheme and artifice to defraud the investors, and to obtain money by means of false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause the transmission by means of wire communications in interstate commerce any writing, sign, signal, and picture, in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

### OBJECTS OF THE CONSPIRACY

82.     The objects of the conspiracy were to unlawfully:  (1) defraud the investors; (2) obtain investor monies and pay undisclosed commissions; (3) inflate the value of the Manipulated Public Companies; and (4) enrich the conspirators.

### MANNER AND MEANS OF THE CONSPIRACY

83.     To attain the objects of the conspiracy, Defendant and his co-conspirators employed the following manner and means:

a.     It was a part of the conspiracy that the co-conspirators created public "shell" companies, executed mergers of nascent businesses with the shells to create publicly traded companies, and then paid undisclosed commissions to consultants, brokers, and boiler room promoters, in exchange for using investor funds to purchase co-conspirators' shares of the resulting stock.

b.      It was a part of the conspiracy that the co-conspirators used manipulative stock trading techniques, such as wash trades, matched trades, and marking the close trades, to fraudulently inflate the price in the Manipulated Public Companies.

c.      It was a part of the conspiracy that Defendant, while working at Marquis, provided investment advice and made investment decisions for clients at his brokerage firm.

d.      It was a part of the conspiracy that Defendant worked with Zirk de Maison in the fraudulent scheme to buy Zirk de Maison's shares in the Manipulated Public Companies using Defendant's client accounts.

e.      It was a part of the conspiracy that the co-conspirators ensured that any time they wanted to sell free trading shares on the open market, there would be an available buyer.

f.      It was a part of the conspiracy that Defendant made trades in client accounts without authorization from clients.

g.      It was a part of the conspiracy that Zirk de Maison paid undisclosed commissions, typically thirty to fifty percent of the total sale price, in exchange for co-conspirators selling Zirk de Maison's shares via private placements, purchasing them using client accounts on the open market, and inducing investors to purchase them through cold calls.

h.      It was a part of the conspiracy that the co-conspirators did not disclose to investors the commission payments from Zirk de Maison and companies he controlled.

i.      It was a part of the conspiracy that Zirk de Maison used registered brokers to liquidate free trading shares of stock in the Manipulated Public Companies and paid the registered brokers commission payments for purchasing Zirk de Maison's shares.

j.      It was a part of the conspiracy that Zirk de Maison used consultants to access wealthy potential investors and paid undisclosed commissions of cash and stock to the consultants when they persuaded their clients to purchase Zirk de Maison's shares in the Manipulated Public Companies.

k.      It was a part of the conspiracy that Jason C. solicited potential investors to purchase stock in the Manipulated Public Companies without disclosing that he received commissions from Zirk de Maison, that it was Zirk de Maison's and Jason C.'s shares his clients were purchasing, and that his clients' investments were used to enrich the co-conspirators.

l.      It was a part of the conspiracy that Zirk de Maison, Jason C., and others, used private placements, stock promoters, and non-arms-length trading with related parties to create the illusion of volume, to inflate the stock price, and to divest their own shares.

m.      It was a part of the conspiracy that Zirk de Maison used boiler room promoters to cold call and solicit potential investors to purchase shares of the Manipulated Public Companies.

n.      It was a part of the conspiracy that the cold calls to potential investors coincided with favorable press releases or other information that Defendant caused to be released.

o.      It was a part of the conspiracy that the boiler room promoters touted the Manipulated Public Companies using high pressure sales tactics and misrepresentations about the value of the Manipulated Public Companies and their stock.

p.      It was a part of the conspiracy that the boiler room promoters did not disclose that Defendant paid commissions to them on the sale of Defendant's stock to the investors, either on the open market or through private placements.

25

q.    It was a part of the conspiracy that to conceal the payment of undisclosed commissions, Defendant and other co-conspirators commonly directed Zirk de Maison to transfer such money to entities and third parties to avoid the appearance of a direct payment from Zirk de Maison to that co-conspirator.

r.    It was a part of the conspiracy that to further hide the undisclosed commission payments, Zirk de Maison made, and caused to be made, payments to Defendant and other co-conspirators from a variety of companies Zirk de Maison controlled, including Bridges, SB3, Suprafin, and Wealthmakers, as well as from the Manipulated Public Companies, instead of from Zirk de Maison's personal bank accounts.

s.    It was a part of the conspiracy that Defendant communicated with the co-conspirators and others, via interstate wires, including through e-mail transmissions, to record commission payments that were made and owed.

t.    It was a part of the conspiracy that Defendant transmitted, and caused the transmission of, interstate wires in the form of undisclosed commission payments to co-conspirators for participating in the conspiracy.

u.    It was a part of the conspiracy that co-conspirators received shares, both restricted and free-trading, of various stock from Defendant to compensate co-conspirators for participating in the conspiracy.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

84.    In furtherance of the conspiracy and to effect its unlawful objects, Defendant and the co-conspirators committed, and caused to be committed, the following acts in furtherance of the conspiracy in the Northern District of Ohio, and elsewhere:

a.  On or about January 16, 2009, Defendant caused funds in the amount of $26,300 to be transferred from a SB3 account held in San Diego, California at City National Bank to a WAH account for the benefit of Defendant, in New York, New York at Citibank.

b.  On or about November 24, 2009, Zirk de Maison caused funds in the amount of approximately $10,000 to be transferred from a Wealthmakers corporate bank account ending in x8413 held in San Diego, California, at City National Bank, to an SMI account controlled by Jason C. and held in Westlake, Ohio, at U.S. Bank.

c.  On or about February 9, 2010, Defendant caused funds in the amount of $40,000 to be transferred from a Wealthmakers account held in San Diego, California at City National Bank to a WAH account for the benefit of Defendant, in New York, New York at Citibank.

d.  On or about June 4, 2010, Zirk de Maison caused funds in the amount of approximately $50,000 to be transferred from a Kensington corporate bank account ending in x4134 held in Santee, California, at Wachovia Bank, to a Worldbridge account controlled by Jason C. and held in Westlake, Ohio, at U.S. Bank.

e.  On or about September 13, 2010, Zirk de Maison caused an email to be transmitted with the subject line "[c]ommissions [p]aid," with an attached spreadsheet that detailed the undisclosed commission payments made to Defendant, Stephen Wilshinsky, Jack T., and other co-conspirators.

f.  On or about July 9, 2012, Zirk de Maison caused funds in the amount of approximately $10,000 to be transferred from a Lustros corporate account ending in x8389 held in Santee, California, at Citibank, to an account in the name of WAH.com held in New York, New York, at Citibank, for the benefit of Defendant.

g.      On or about March 14, 2013, Defendant caused funds in the amount of $22,000 to be transferred from a Suprafin account held in Santee, California, at US Bank, to an account in the name of Defendant held in Stevenson Ranch, California at JP Morgan Chase.  The wire transfers among these accounts and banks were processed through a clearinghouse and the FedWire funds transfer system, which was outside of the state of California.

All in violation of Title 18, United States Code, Section 1349.


STEVEN M. DETTELBACH
United States Attorney


By:  *Ann C - Rowland*

ANN C. ROWLAND
Deputy Chief, Criminal Division